# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

**No. 20-154V**

|  |  |
|---|---|
| SARAH EICHORN, | Chief Special Master Corcoran |
| Petitioner, | Filed: November 7, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Amber Diane Wilson, Wilson Science Law, Washington, DC,* for Petitioner.

*Ronalda Elnetta Kosh, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On February 14, 2020, Sarah Eichorn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine she received on October 25, 2018. Petition at 1-2. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement was conceded, the parties could not resolve damages on their own.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$85,259.62, representing $78,000.00 for actual past pain**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**and suffering, plus $7,259.62 for future pain and suffering (reflecting an award of $250.00 per year, discounted to net present value).**

### I.      Relevant Procedural History

Approximately a year and a half after this case was initiated, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation. ECF No. 26. On March 28, 2022, Petitioner filed a Motion for a Decision on the Evidence (ECF No. 33 ("Br.")), and I thereafter issued a ruling on entitlement. ECF No. 34.

The parties could not agree to damages, however (and in fact knew of their impasse at the time entitlement was sought). Accordingly (and because Petitioner set forth her damages request in her entitlement motion), Respondent was ordered to file a response to Petitioner's damages position, and did so on August 17, 2022. ECF No. 39 ("Opp."). Petitioner filed a reply on August 26, 2022. ECF No. 50 ("Reply"). The parties agreed to argue their positions at a Motions Day hearing, at which time I would decide the disputed damages issues. ECF. No. 42. That hearing was held on August 25, 2023.[3] On October 3, 2023, the parties filed a post-hearing joint status report regarding the discount rate and life expectancy to be used to determined Petitioner's future pain and a suffering award. ECF No. 43. The case is now ripe for a determination.

### II.      Relevant Medical History

A complete recitation of the facts can be found in the Petition, the Rule 4(c) Report, and the parties' respective pre-hearing briefs. In summary, at the time of vaccination Ms. Eichorn was an active 38-year-old intensive care unit (ICU) nurse, who participated in a variety of activities including yoga, Pilates, barre, weightlifting, distance running, and playing with her children, with a non-contributory medical history. *See* Ex. 7 at 1; Petition at 1. Petitioner received a flu vaccine in her right deltoid on October 25, 2018, at her place of employment UnityPoint Health. Ex. 1 at 1.

On October 29, 2018, Ms. Eichorn had an appointment with Dr. Daphney Myrtil at UnityPoint Health Occupational Medicine with right shoulder pain. Ex. 2 at 2-3. Ms. Eichorn reported, "My coworker gave me my mandatory flu shot in my right arm. It didn't feel right when injected & she had a difficult time. Injection site was too [high]." *Id.* at 2. Petitioner stated that she lost a significant amount of range of motion (ROM) for three days, which had improved, but also deep, achy, bone pain at rest, difficultly performing

---

[3] At the end of the hearing held on August 25, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing. The transcript from the hearing is fully incorporated into this Decision.

activities of daily living (ADLs) with her right arm, and that she could not sleep on her right side. *Id.* Petitioner took Tylenol for pain, which she reported at 6-7 out of 10. *Id.* at 3. Petitioner's lift-off, Neer's, cross-arm, Hawkins, and empty can tests were positive. Petitioner was assessed as having a work-related SIRVA, was prescribed Celebrex for pain, and instructed to return for follow-up. *Id.* at 3, 5.

On November 7, 2018, Ms. Eichorn returned for a follow-up with Dr. Myrtil. Ex. 2 at 7. Petitioner was noted as having improvement, but still experiencing symptoms. *Id.* Petitioner rated her pain at 4-5 out of 10, and received her first steroid injection at this visit. *Id.* One week later, on November 14, 2018, Ms. Eichorn returned to Dr. Myrtil with drastic improvement of her symptoms from her previous visit. *Id.* at 10. All tests were negative, she was at her baseline, and was discharged from care. *Id.* However, two weeks later, on November 29, 2018, Ms. Eichorn returned to Dr. Myrtil again complaining of right shoulder pain. *Id.* at 12. Petitioner reported that she felt like the effects of the steroid injection had worn off and reported having difficulty with overhead activities and lifting. *Id.* She rated her pain at 5 out of 10. *Id.* Petitioner was referred to physical therapy (PT) and was instructed to follow-up after six sessions. *Id.*

On December 4, 2018, Ms. Eichorn received a PT evaluation and initial plan of care. Ex. 5 at 14. The plan of care indicated that Petitioner would benefit from comprehensive PT intervention to restore full motion at functional strength right upper extremity, resolve sleep and ADL interruption, and to receive education regarding shoulder mechanics and home exercise as indicated. *Id.* She rated pain 3 out of 10 on evaluation. *Id.* at 10. Petitioner attended 12 PT sessions from December 4, 2018, through January 22, 2019. *Id.* at 15-32.

On December 19, 2018, Ms. Eichorn had another follow-up with Dr. Myril. Ex. 2 at 14. Dr. Myril noted that Petitioner was making little progress with PT and that she had even less range of motion since her previous visit. Petitioner rated her pain at 2-3 out of 10. *Id.* Dr. Myril referred Petitioner for an MRI. *Id.* Ms. Eichorn had a right shoulder MRI on December 28, 2019. Ex. 6 at 2. The MRI revealed, "Mild infraspinatus tendinopathy without discrete partial or full-thickness tear. Neighboring greater tuberosity demonstrates mild edema. Constellation of finding may reflect sequela of flu shot. There is no overt bony destruction. 2. No evidence for septic arthritis." *Id.*

Ms. Eichorn had follow-up visits with Dr. Myrtil on January 22, 2019, and again on February 12, 2019. Ex. 2 at 19, 21. At the February visit, Ms. Eichorn rated her pain at 2-4 out of 10. Petitioner reported that she had experienced no improvement, ADLs were still challenging, and she could not restart her usual exercise program, but was tolerating her full job duties without restrictions. *Id.* at 21. Dr. Myrtil noted that Ms. Eichorn was not following the typical course of recovery, and was referred to orthopedics due to lack of

3

improvement and continued symptoms. *Id.* Ms. Eichorn saw orthopedist, Dr. Kyle Galles on March 25, 2019, with 3 out of 10 intermittent and fluctuating pain in her right shoulder. Ex. 4 at 5. Dr. Galles recommended an intra-articular injection and additional PT with all efforts and emphasis on range of motion only, no strengthening. *Id.* at 6-7. Petitioner received a second steroid injection at this visit. *Id.* at 6.

Ms. Eichorn received a second PT evaluation and initial plan of care on April 2, 2019. Ex. 5 at 32. The plan of care indicated that Petitioner would benefit from PT for increased motion, increased strength, and decreased pain to return to normal and work life function. *Id.* at 33. Her pain was 0/10 at rest but increased with shoulder movement. *Id.* Petitioner attended 27 PT sessions from April 5, 2019, through July 16, 2019 (she attended 18 sessions from April 5, through June 4, 2019, was recertified for PT on June 4, 2019, and attended 9 sessions from June 11, through July 16, 2019). *Id.* at 35-75. By July 16, 2019, Ms. Eichorn's shoulder pain was rated at 0 out of 10 at rest and 3-4 out of 10 with movement of right shoulder. Ex. 5 at 74. Although it was noted that Petitioner made progress with increased range of motion, she continued to show deficits in strength and motion and limiting daily function with reaching overhead and behind. Additional PT was recommended; however, Petitioner did not continue PT. *Id.*

On September 24, 2019, Ms. Eichorn had a follow-up with Dr. Galles. Ex. 8 at 5. Dr. Galles stated, "[Ms. Eichorn] thinks she has made really quite a bit of improvement since our last visit with the help of outpatient physical therapy. Still some mild stiffness and mild discomfort, but overall much improved." *Id.* Petitioner had another follow-up with Dr. Galles on October 31, 2019. Ex. 8 at 3. Petitioner described her pain as mild, occurring rarely, improving, aggravated by movement, and relieved at rest. *Id.* Dr. Galles was pleased with Petitioner's progress and indicated she was 95% back to normal. *Id.* Dr. Galles noted that Petitioner had reached maximum medical improvement and for her to continue with exercises. *Id.* at 4. On November 14, 2019, as part of her workers' compensation claim, Dr. Galles stated that Petitioner had a permanent total upper extremity impairment of 6%. Ex. 15 at 34.

### III.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

*Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at \*22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at \*9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at \*3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at \*9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at \*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 489-90 (2013). The *Graves* decision maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Although *Graves* is not controlling of the outcome in this case, it emphasizes the need to focus on what the *petitioner* in question should rightfully receive, all things being equal (although it does not preclude consideration of what comparable other claimants received).

## IV.   Appropriate Compensation in this Matter

### A.  Past Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed, leaving only its severity and duration to be considered. In determining appropriate compensation for Petitioner's pain and suffering, I have carefully reviewed and considered the complete record in this case. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating such cases. However, my determination is ultimately based upon the specific circumstances of this case.

Ms. Eichorn maintains that preponderant evidence supports an award of $85,000.00 in actual pain and suffering, at a minimum. Br. at 17. Her case involved seeking immediate medical attention, which not only reflected the severity of her initial injury but also impacted her future medical course. *Id.* at 17-18. Despite receiving a medical evaluation and prescription anti-inflammatory therapy plus work rest almost immediately after her injury, Ms. Eichorn asserts, she never thereafter returned to her prior baseline. *Id.* at 18. She initially rated her pain within the upper half of a ten-point scale for at least five to six months, received two steroid injections, and suffered severe limitations in range of motion initially. The injury also entailed accommodations at work, she did not wait to receive treatment or decline any treatment advised, and she diligently and consistently attended PT. *Id.* Even after the cessation of treatment, she has continued since receipt of her vaccine to experience pain and limitations in her activities of daily living. *Id.* at 17-18. Despite the injury occurring more than three and a half years ago, Petitioner asserts that she is still performing a consistent home exercise program to maintain her range of motion, while also avoiding overuse that would cause significantly increased pain. *Id.* at 18.

As comparable cases, Petitioner references *Dirksen*, *Accetta*, and *Dhanoa*, in which claimants received pain and suffering awards between $85,000.00 and $95,000.00.[5] *See* Br. at 15-18. Petitioner deems herself similarly situated, and thus

---

[5] *Dirksen v. Sec'y of HHS,* No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Oct. 18, 2018) (awarding $85,000.00 for past pain and suffering); *Accetta v. Sec'y of HHS,* No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Mar. 31, 2021)  (awarding $95,000.00 for past pain and suffering); *Dhanoa v. Sec'y of HHS,* No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Feb. 1, 2018) (awarding $85,000.00 for past pain and suffering).

should be awarded at least $85,000.00 in past pain and suffering. Br. at 20. Petitioner asserts that her case is distinguishable from *Dirksen* because of the significant gaps in treatment with no mitigating factors for those gaps; nevertheless, it was determined that the *Dirksen* petitioner suffered significant pain and suffering for eight months after onset and reduced sequela thereafter. Br. at 17. Additionally, like the petitioner is *Dhanoa*, Petitioner reported limitations in her activities of daily living, ability to perform her household chores, exercise, and sleep. Br. at 17.

In response, Respondent recommends a past pain and suffering award of $70,000.00. Opp. at 2. Petitioner initially reported severe pain after vaccination, but her symptoms improved within one month. *Id.* at 11. Thereafter, Petitioner only rated her pain at a 2-4/10 level, and her symptoms continued to improve; three months after vaccination Petitioner reported that her shoulder was about 85% improved, with only intermittent pain that she rated as 2-3/10, and at her job, she was released on full duty without restrictions. *Id.* Then, merely nine months after vaccination, Petitioner reported that she rarely had pain, rated her current pain a 0/10, and only complained of mild stiffness and discomfort. Opp. at 11-12. Respondent also argues that the contemporaneous medical records indicate that Petitioner's shoulder injury limitations resolved prior to the conclusion of her treatment, and although she received a permanent upper extremity impairment rating of 6%, she was released to full activities without restriction. *Id.* at 12. Petitioner's symptoms consistently improved with conservative treatment, and her nine-month treatment course ultimately consisted of multiple doctor's visits, one MRI, two steroid injections, one prescription, physical therapy, and a home exercise program. *Id.* Accordingly, "[b]y any reasonable measure, [P]etitioner's injury was mild and limited." Opp. at 12.

Respondent asserts that the comparable cases cited by Petititoner, *Dirksen*, *Accetta*, and *Dhanoa*, confirm that his proffer was reasonable, fair, and appropriate – and yet Petitioner has failed to demonstrate that she is entitled to more than $70,000.00. Opp. at 11. Those cases involved pain that was more severe, lasting up to four times as long as that of Ms. Eichorn, who "only received treatment for one year at which time she reported that she was 95% back to normal." Opp. at 12-14. Respondent also notes that Ms. Accetta's "course was more prolonged and ongoing nonconservative treatment was recommended for her injury due to persistent ongoing pain . . . . " Opp. at 13-14. Respondent maintains that *Vinocur*, *Celuch*, and *Winkle*[6] (all awarding damages between $68,500.00 and $70,000.00) are better comparables, and consistent with his proffered sum of $70,000.00. Br. at 16.

---

[6] *Vinocur v. Sec'y of HHS,* No. 17-598V, 2020 WL 1161173 (Fed. Cl. Jan. 31, 2020) (awarding $70,000.00 for past pain and suffering); *Celuch v. Sec'y of HHS,* No. 18-544V, 2021 WL 2368137 (Fed. Cl. May 10, 2021) (awarding $70,000.00 for past pain and suffering); *Winkle v. Sec'y of HHS*, No. 20-485V, 2022 WL 221643 (Fed. Cl. Jan. 11, 2022) (awarding $68,500.00 for past pain and suffering).

The record reveals that Petitioner overall had a generally mild-to-moderate course of SIRVA – one MRI, two cortisone injections, three rounds of PT (a total of 39 sessions: 12, 18, 9), pain rated at 2-7 out of 10, approximately one year in duration, and a documented 6% permanent partial disability, for which she had a successful workers' compensation claim and voluntary payment of permanency benefits equal to 6% in the right arm. Ex. 15 at 32. She also did not undergo surgery – meaning (in accordance with most pain and suffering awards in SIRVA cases) she likely should not receive in excess of $100,000.00.

While the cases cited by both Petitioner and Respondent provide an instructive starting point in determing damages, no cited case is completely analogous. All of the cases cited by Petitioner, for example, involved sequela of three and half to five years, far longer than Ms. Eichorn's course. *See Dirksen*, 2018 WL 6293201, at *10 (noting a three-month delay in treatment, eight months of significant pain and suffering, followed by reduced sequela for four years); *Accetta*, 2021 WL 1718202, at *5 (noting a one-month delay in treatment and three and a half year treatment gap less than six months after vaccination, and Ms. Accetta did not return for treatment for almost one year after surgery was recommended); *Dhanoa*, 2018 WL 1221922, at *6 (saw her PCP within six weeks of vaccination and had an injury lasting more than three and a half years).  However, this is balanced by the fact that all of those had slight to significant delays in treatment. *See, e.g., id.* While those factors are counterbalancing, those are not facts present in this case.

At the same time, Respondent's cases involve sequela that are clearly *less severe* when compared with that of Ms. Eichorn. Ms. Eichorn attended significantly more PT than the *Vinocur* petitioner (15 sessions compared with 39 sessions), the duration of her injury was longer (nine months compared with one year), and she received more cortisone injections. *See Vinocur*, 2020 WL 1161173, at *12-*13. Although the *Vinocur* petitioner rated his pain higher than Ms. Eichorn, there was also a four-month delay in treatment. *Id.* Although the *Celuch* claimant reported comparable pain levels, that individual delayed treatment for two months, only attended 24 PT sessions, only had one steroid injections, and her injury lasted eight months. *See Celuch*, 2021 WL 2368137, at *4-*5. Finally, the *Winkle* petitioner experienced a longer course but underwent four steroid injections, plus only experienced mild pain (rated at 0-1/10), while delaying treatment initially for the significant period of five months. *Winkle*, 2022 WL 221643, at *5-*6.

The record establishes that Ms. Eichorn experienced and reported her pain almost immediately, and was seen by a physician within four days of vaccination. Ms. Eichorn consistently received treatment during her one-year course of her injury; thus, the delays and gaps in treatment as found in some cases cited by the parties are not present here. In *Miller v. Sec'y of HHS*, the petitioner was treated by her primary care physician and an orthopedist, was prescribed steroid medication, had two cortisone injections, had x-rays

and one MRI, and participated in 24 physical therapy sessions. *Miller v. Sec'y of HHS*, No. 20-959V, 2023 WL 4312920, *2 (Fed. Cl. June 1, 2023).[7] That individual described moderate to severe pain (between 7/10 and 10/10) at the beginning of her injury, which reduced over the course of treatment. *Id.* at *5. She also treated her injury for approximately ten months with good results, although she described ongoing mild symptoms for an additional six months before full recovery, for a total duration of sixteen months – and resulting in an $80,000.00 award.

Although none of the cases cited herein by either side are precisely on point, the totality of evidence does suggest a past pain and suffering award close to, but slightly less than, *Miller*. Thus, and pursuant to my oral ruling on August 24, 2023 (which is fully adopted herein), **I find that $78,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering.**

## B.  Future Pain and Suffering

Ms. Eichorn contends that her shoulder injury is permanent and will continue to limit arm usage for the rest of her life (calculating a life expectancy of an additional 43.8 years). Br. at 19. Petitioner argues that she has been assessed with having reached maximum medical improvement and her medical records clearly indicate that her shoulder injury has been rated as *permanent*. *Id.* Petitioner notes that as part of her workers' compensation claim, Dr. Galles opined that Petitioner had a total upper extremity impairment of 6%. *Id.* at 21 citing Ex. 15 at 34. Ms. Eichorn argues that she continues to live with daily pain and limitations from her SIRVA and her physician assessed an increased risk of this injury affecting her other shoulder in the future. *Id.* at 22-23. As an ICU nurse, she asserts that she is required to find accommodations and help to perform her job. *Id.* a 23. Ms. Eichorn argues that she has not been able to resume her prior life without having to limit herself and now due to a new pandemic, she is required to increase her risk of an adverse injury by the unexpected public health need for new vaccines. *Id.* Petitioner states that she is still apprehensive of the needle, causing her to choose her left arm for additional vaccines.

In her affidavit, Petitioner asserts that her dominant arm "has never been the same" since her SIRVA injury, with pain and limited ROM, particularly when she lifts her arm above her head. She asserts that her pain and limited ROM have not improved or changed since she was released from medical care. Ex. 18 at 1-2. Petitioner states that her PT has indicated that additional treatment options will yield no additional improvement because she has a permanent disability. *Id.* Petitioner cites to *Goldman*, *Desai*, and

---

[7] The decision in *Miller* was filed before Motions' Day, but after this case was fully briefed.

*Binette* to support a future pain and suffering award in this case.[8]  Respondent argues that Ms. Eichorn's overall course was less severe than the petitioners in the cases she cites, and a future pain and suffering award is therefore not warranted.

Future pain and suffering awards are reserved "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta*, 2021 WL 1718202 at *5. I am generally reluctant to award future pain and suffering in SIRVA cases, unless there is compelling evidence in the medical record that a treating provider has confirmed a permanent form of loss. Here, however, there is documented evidence that Ms. Eichorn has suffered a permanent disability, and so a future pain and suffering award is appropriate. Considering Petitioner's modest 6 percent impairment, however, that component should not be particularly large. I therefore award Petitioner **$250.00 per year for the remainder of her life**.

In keeping with Vaccine Program practice, however, I must next reduce Petitioner's award figure to its net present value. *See* Section 15(f)(4)(A) (requiring that future compensation awards be reduced to their net present value). The parties were instructed to inform me of their proposed net discount rate. On October 3, 2023, Respondent filed a joint status report on behalf of the parties indicating that the parties "agree that a one percent (1%) net discount rate should be applied to the award for future pain and suffering for the first fifteen (15) years, then a two percent (2%) net discount rate should be applied to the award for future pain and suffering thereafter." ECF No. 43. However, the parties stated that they disagreed as to Petitioner's life expectancy calculation. *Id.* Respondent states that his life expectancy calculation is "41 years, and is based on National Statistics Reports, Volume 70, No. 19, March 22, 2022, Table 3, a formal report that uses data from annual mortality rates, the census, and Medicare." Petitioner states that her life expectancy calculation is "42.5 years, and is based on the Social Security Calculator which is an informal calculation tool that is based on the gender, date of birth, and information from a cohort of life expectancy tables." *Id.*

Historically within SPU, I have used the life expectancy calculator found on the Social Security Administration's website to determine a petitioner's remaining life expectancy for the purposes of calculating a future pain and suffering award. *See Dawson-Savard v. Sec'y of HHS*, No. 17-1238V, 2020 WL 4719291, *4 n.11) (Fed. Cl. July 14, 2020); *Danielson v. Sec'y of HHS*, No. 18-1878V, 2020 WL 8271642, *5 n.10

---

[8] *Goldman v. Sec'y of HHS,* No. 16-1523V, 2020 WL 6955394 (Fed. Cl. Nov. 20, 2020) (awarding $1,000.00 for the remainder of life expectancy for future pain and suffering); *Desai v. Sec'y of HHS,* No. 14-811V, 2020 WL 8768069 (Fed. Cl. Dec. 21, 2020) (awarding $1,000.00 for the remainder of life expectancy for future pain and suffering); *Binette v. Sec'y of HHS*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Mar. 20, 2019) (awarding $1,000.00 for the remainder of life expectancy for future pain and suffering).

(Fed. Cl. Dec. 29, 2020); *Setaro v. Sec'y of HHS*, No. 19-207V, 2021 WL 1440207, *5 n.12 (Fed. Cl. Mar. 16, 2021); *Stromer v. Sec'y of HHS*, No. 19-1969V, 2022 WL 1562110, *11 n.13 (Fed. Cl. Apr. 8, 2022); *Smith v. Sec'y of HHS*, No. 19-1384V, 2022 WL 3012509, *8 n.24 (Fed. Cl. June 29, 2022); *Mulloy v. Sec'y of HHS*, No. 19-1396V, 2023 WL 2620653, *9 n.8 (Fed. Cl. Mar. 24, 2023). And Respondent has not presented a compelling reason why I should deviate from using this United States Federal Government resource. Thus, I will continue to use the life expectancy calculator found on the Social Security Administration's website, as I have done in previous SPU cases, to calculate Ms. Eichorn's life expectancy. Accordingly, I accept Petitioner's life expectancy figure – and the future pain and suffering award of $250.00 per year for the remainder of her life, over a 42.5-year period, comes out to $10,625.00.[9]

In keeping with Vaccine Program practice, however, I must next reduce this $10,625.00 figure to its net present value. *See* Section 15(f)(4)(A) (requiring that future compensation awards be reduced to their net present value). The parties have agreed to utilize a one percent net discount rate for the first fifteen years of the award, followed by a two percent net discount rate for the remaining 27.5 years. Applying the multi-pronged net discount rate agreed upon by the parties, Petitioner's $10,625.00 award for future pain and suffering totals **$7,259.62.**[10]

---

[9] The Social Security Administration (SSA) calculates life expectancy. Their life expectancy calculator can be found at https://www.ssa.gov/OACT/population/longevity.html (last visited August 25, 2023). According to SSA's life expectancy calculator, Ms. Eichorn has an additional life expectancy of approximately 42.5 years.

[10] This figure was calculated in Microsoft Excel using the present value or "PV" function. The PV function syntax is: -PV (rate (*r*), number of payment periods (*n*), payment amount (PMT), future value (FV) (optional), and type (optional)). In other words, $PV = FV / (1+ r)^n + PMT / r [1 - 1/ (1+ r)^n]$. In this case, $r = 0.01$ (years 1-15) or 0.02 (years 16-43); PMT = $250.00; $n = 1$ (represents 1 payment period or 1 year); FV is variable, and the "type" was not used for these calculations. For the purposes of the calculation in Excel, "PV" is negative representing a cash outflow, *e.g.*, purchasing a stock, bond, or annuity and thus, an initial negative cash outlay.

Each year (42 years representing Petitioner's expected future life expectancy) was calculated separately (in an individual cell) using the same syntax, which resulted in the present value of the award for the current year, and the future value of the award for the subsequent year. The first 15 payments (or years) were calculated using a 1% discount rate, 1 payment, $250.00 payment amount, with the future value being the value of the previous year's award. Beginning with payment/year 16, payments 16 through 42 were calculated using a 2% discount rate, 1 payment period, $250.00 payment amount, with the future value being the value of the previous year's award. Since Petitioner's remaining life expectancy is 42.5 years, there was a 43rd calculation representing the additional 1/2 year of life expectancy. The 43rd payment/year was calculated using a 2% discount rate, 0.5 payment period (representing half of the year), $250.00 payment amount, with the future value being the value of the previous year's award. For example: the syntax for Year 1 (cell B2) is "=-PV(0.01,1,250)" yielding a value of $247.52; the syntax for Year 2 (cell C2) is "=-PV(0.01,1,250,B2)" yielding a value of $492.60; the syntax for Year 16 (cell Q2) is "=-PV(0.02,1,250,P2)" yielding a value of $3,643.40; and the syntax for Year 43 (cell AR2) is "=-PV(0.02,0.5,250,AQ2)" yielding a value of $7,259.62.

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, I find that **$78,000.00 represents a fair and appropriate amount of compensation for Ms. Eichorn's past pain and suffering.** I find that and award of **$250.00 per year, reduced to net present value of $7,259.62**, is appropriate compensation for future pain and suffering.

Accordingly, **I award Petitioner a lump sum payment of $85,259.62 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.